[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
A.
Introduction and Factual Background
1. CT Page 3415
This decision concerns two cases, tried together, between a former landlord, Tolland Enterprises, and its tenant, DiBella Brothers, Inc. The first case, CVH-87-082558, involves claims for financial injuries suffered as a result of the landlord's alleged failure to approve an assignment of a lease and for committing unfair and deceptive acts. The second case, CVH-87-082557, involves a claim by the landlord against the tenant for its alleged failure to pay rent or use and occupancy.
2.
Tolland Enterprises (hereinafter, Tolland) is the owner and landlord of the Wintonbury Mall in Bloomfield, Connecticut. The subject property is a 10,000 square foot building which was formerly rented to "Chuck E. Cheese", a restaurant no longer in business. William DiBella, a one-third shareholder of DiBella Brothers, Inc. (hereinafter, the corporation), attended and purchased the assets of "Chuck E. Cheese" at auction. The corporation then entered into the lease with Tolland for the same premises at 48 Jerome Avenue in Bloomfield with a commencement date of March 1, 1985.
Mr. DiBella, with his two brothers, Thomas and Anthony, also one-third shareholders of the corporation, guaranteed payment of said lease up to an aggregate sum of $30,000.00. The lease term was for five years. William DiBella testified that he invested approximately $350,000.00 in the restaurant and that it opened in March 1985 under the name "Banjoe's Family Pizza Playhouse". The restaurant operated at a deficit from its opening — although, the deficit did decrease each month.
On or about June 1986, the corporation, through William DiBella, met with Tolland requesting a grace/deferral period of three months (July, August and September) on the payment or rent. The testimony was that the corporation was losing money and that the restaurant had been listed for sale for 6 months with V.R. Business Brokers on April 9, 1986. By deferring the rental payments, the restaurant could remain in business and thus be sold as an ongoing operation. The testimony conflicted as to when the deferred rent was to be paid with William DiBella indicating it would be due on demand and Robert Beckenstein, a partner of Tolland, indicating the rent would be due in October 1986 or when the restaurant was sold. The restaurant was not sold during this period.
A second listing agreement was signed on December 10, 1986 by Thomas D. DiBella with his fellow Lion Club member Sal Camilleri, the owner of Century 21 Town Line Realty. On or about December 22, 1986, Mr. Camilleri prepared a contract for CT Page 3416 sale of the restaurant at a price of $350,000.00 on behalf of his future son in-law, David Cyr. The contract was subject to certain contingencies and required a deposit which was never paid. Mr. Cyr invested considerable time at the restaurant familiarizing himself with all aspects of the operation and he also reviewed the financial records.
Mr. Cyr, his attorney Jay Kearns, Thomas DiBella, his attorney Charles Gersten, Sal Camilleri, Robert Beckenstein and Tolland employee Ron Gross met to discuss the lease on February 27, 1987. William DiBella was unable to attend as he was in the hospital. The testimony differed as to what transpired at the meeting. Mr. Camilleri indicated that the meeting, at which Mr. Cyr's financial qualifications were questioned, did not go well. Indeed, he testified that it was because of the meeting that Mr. Cyr decided to not purchase. Attorney Kearns stated that Mr. Cyr was "down in the dumps" after the meeting and that Mr. Beckenstein had indicated there would be no approval for a lease assignment.
Thomas DiBella stated that when Mr. Cyr's financial qualifications did not meet with the landlord's expectations, the "meeting went down hill." Mr. Cyr testified that he was questioned about his experience and ability to operate the restaurant and that there was no decision made as to a lease assignment. It was his understanding that even if Tolland did allow the assignment, it would not release the corporation. Mr. Cyr had no restaurant experience and his financial statement consisted of a one page statement of assets.
After this meeting, Mr. Cyr met with Mr. Camilleri and Thomas DiBella on March 6, 1987 at which time he told Mr. DiBella that he had been deceived as the financial information was incorrect and inflated. At trial, Mr. Cyr testified that certain financial data concerning a bill changer and token machine was wrong. Further, he testified that he had been shown a business profile (Exhibit 2) for the restaurant — a document which clearly is at odds with the testimony in this case. Finally, he indicated that until the February meeting he had not known that the rent was not current when he made his offer to purchase.
On or about April 16, 1987, Mr. Camilleri's firm produced a second buyer, one Joseph Sullo, a business competitor of William DiBella. Once again, while the contract called for a deposit, no deposit was made by Mr. Sullo. Moreover, the corporation never made any request for an assignment of the lease.
William DiBella sought a meeting with his landlord and after a few unsuccessful attempts, he finally arranged a CT Page 3417 meeting on May 1, 1987. Mr. Robert Beckenstein told Mr. DiBella that Tolland no longer wanted the restaurant as a tenant. After some discussion, Mr. DiBella contacted his attorney and attempted to deliver a check (Exhibit K) covering all rent due to the landlord. Tolland refused to accept the check and returned to the corporation a few days later. A notice to quit was served on the corporation on May 2, 1987 ordering the corporation to vacate the premises by May 12, 1987 (Exhibit F). The corporation did vacate the premises in June 1987 and the property was then leased to The Bank of Boston Connecticut with a lease commencing November 1, 1987 and dated February 1, 1988. (Exhibit 8). The landlord had been meeting with the Bank since December 1986 with a letter of intent being issued on March 6, 1987. (Exhibits Y, Z, AA, 8B, CC).
 II.
Discussion
 A.
The corporation's claim is essentially that the landlord failed to approve an assignment of the lease to Mr. Cyr or Mr. Sullo and that, as a result of that failure, the corporation suffered a financial loss. As mentioned, the lease was negotiated for a five year term starting on March 1, 1985 and the restaurant sought to assign the lease in February 1937. Paragraph six states, in part, that the "[t]enant shall not sublet the premises . . . or assign the lease or permit the premises to be used or occupied, in all or in part, by others without the written consent of the landlord." In Robinson v. Weitz,171 Conn. 545, 549 (1976) the court stated, "[g]enerally, where a lease simply provides that the lessor's written consent to an assignment is required, the lessor may refuse consent and his reason is immaterial. . . . If, however, the terms of the lease also provide that the lessor's consent to an assignment will not be unreasonably withheld, the lessor may not arbitrarily refuse his consent where the proposed assignee is an unobjectionable and responsible person." (Citations omitted). It is clear that this lease falls into the first category and thus, Tolland could refuse with its reason being immaterial. Jones v. O'Connell, 189 Conn. 648, 653 (1983). It should be noted, however, that recently there has been a departure from this traditional view as the law does not favor restraints on alienation. Id. For instance, in Jones, the court moved from the traditional view to "a middle road" (at least as to enforcing provisions imposing conditions on the transfer of hybrid cooperative apartments) noting that "unlimited consent clauses . . . constitute illegal restraints because they fail sufficiently to recognize the legitimate interest of the holder of the lease-hold CT Page 3418 to enjoy reasonable access to a resale market." Id., 654.
In Warner v. Konover, 210 Conn. 150, 153-155 (1989), our Supreme Court declared that "a landlord who contractually retains the discretion to withhold its consent to the assignment of a tenant's lease must exercise that discretion in a manner consistent with good faith and fair dealing." The evidence in this case indicates that under this test the landlord's decision cannot be faulted. First, the corporation was seriously behind in its rent at the time of the February meeting. On two prior occasions the landlord wrote to the corporation requesting that it become current in its rental payments. (Exhibits C, D). There is a real question as to whether Tolland, the injured party, was under any further duty to perform Rokalor, Inc. v. Connecticut Eating Enterprises, Inc.,18 Conn. App. 384, 391 (1989). More importantly, faced with a major chain restaurant ("Chuck E. Cheese") going bankrupt and a local restaurant with experienced operators (the corporation) failing, the landlord certainly had a right to be concerned about the potential buyer, David Cyr, who had no restaurant experience. Tolland was never provided with a complete financial statement; it was given a 1/2 page document with Mr. Cyr's assets — nothing about liabilities (Exhibit 10). It was not Tolland's duty to obtain that information. Interestingly enough, Mr. Cyr testified that he did not believe the request for the assignment was totally rejected. Indeed, his testimony — that he cancelled the contract after the meeting with the landlord because he felt the corporation attempted to deceive him as to the restaurant's worth — makes the issue of the assignment moot. Having so cancelled the contract, Mr. Cyr left the corporation with nothing to assign. Even if Mr. Cyr wanted to consummate the contract with the corporation, this court does not believe that the duty to exercise good faith and fair dealing obligates a landlord to accept an assignment or a lease to an unknown tenant with no experience in the designated use and with unknown or questionable financial ability. Robinson v. Weitz, supra, 550.
Mr. Cyr's cancellation also renders the allegations concerning the landlord's negotiations with The Bank of Boston moot. This court is not persuaded that a landlord acts in bad faith because he attempts to secure a new tenant when his existing tenant is seriously behind in rent, has indicated that it is not making money and has sought to sell its business. Accordingly, this court finds that the corporation has failed to prove its claims that Tolland wrongfully refused to approve an assignment of its lease, breached the implied covenant of good faith and fair dealing or tortiously interferred with the corporation's contractual relations and business expectations. There is no CUTPA violation. CT Page 3419
2.
The corporation has made a similar claim for the Sullo contract. (Exhibit J). Inasmuch as no representative of the corporation ever requested the landlord to approve an assignment for Mr. Sullo, the corporation cannot prevail on this claim.
 B.
1.
The landlord has, as indicated, brought an action for nonpayment of rent or use and occupancy for the three months (July, August, September) in 1986, and February through October 1987. Additionally, the landlord seeks to hold the DiBella brothers individually liable under the limited guaranty attached to the lease (Exhibits A, 9). The landlord is seeking damages of $60,107.01 against the corporation, consisting of $34,337.31 rent to and including May 1, 1987 and damages/rent through November 1987 when the Bank of Boston commenced payment under its lease. Ronald Gross, the chief financial officer for Tolland, testified that the total owed through October 31, 1987 is $55,201.68 with $34,337.31 owed as of May 1, 1987. Earlier testimony by William DiBella as well as the lease amendment indicates that the rent was $4,905.00 each month.[1]
(Exhibits A, B).
2.
Both parties acknowledge that as of the May 1, 1987 meeting, $34,337.31 was due the landlord. The corporation claims that as the money was tendered and refused, it is no longer liable for said sum. Both parties have cited cases concerning tender and refusal of rent as they apply to summary process/possession actions. For example, the corporation refers to Tehrani v. Century Medical Center, P.C., 7 Conn. App. 301,305 (1986) for the proposition that [the landlord's] "refusal to accept the tender of rent excused the defendant from further production of the amount then due and barred the plaintiff's right to claim a forfeiture of the tenancy on the basis of nonpayment of rent and to institute an eviction action on that ground." The landlord refers to Mayron's Bake Shops, Inc. v. Arrow Stores, Inc., 149 Conn. 149 (1961) which concerns the tender of rent prior to the unequivocable act declaring the lease terminated. Both cases are not apposite to the present proceeding. This is not a summary process case. Had it been, this court could find that the refusal to accept the May 1, 1987 tender, prior to the May 2, 1987 notice to quit, does CT Page 3420 preclude the landlord from claiming a forfeiture based on nonpayment of rent. Id. 156. This case is different — it is one for damages. The refusal to accept the $34,337.31 as rent does not mean that the landlord is not entitled to that money as contract damages. Simply put, the landlord's refusal only precluded him from terminating the lease for non-payment of rent.
Thus, the issue is not when the unequivocal act occurred — March 3, 1987 (Exhibit E) or May 2, 1987 (Exhibit F) but whether the landlord is entitled to damages for breach of contract of lease. In Rokalor, Inc. v. Connecticut Eating Enterprises, Inc., supra, 389, the court discussed a landlord's options for a tenant's breach of lease. A landlord is not without legal recourse to recover damages simply because he terminates a lease. "Although he cannot institute an action for rent due under the lease, he may sue for a breach of the lease. Where the action is one for breach of the lease, basic contract principles apply." Id. 389. The court added: "[t]he award should place the injured party in the same position as he would have been in had the contract been fully performed." Id. 389 citing Lar-Rob Bus Corporation v. Fairfield, 170 Conn. 397, 404-405
(1976).
Connecticut law clearly recognizes the right of a landlord to terminate a lease but receive use and occupancy payments from the tenant. General Statutes section 47a-26b; OP Realty v. Santana, 17 Conn. App. 314, 318 (1989). Thus, a rent disclaimer notice is allowed in a notice to quit. In Zitomer v. Palmer, 38 Conn. Sup. 341, 343-44 (App. Sess. 1982) the court concluded "[t]he added statement clearly admonishes that any sums offered after receipt of the notice will be retained for purposes other than rent. The admonition serves two useful purposes. It avoids misleading tenants who tender late payments and it insulates the summary process action from being flawed by the acceptance of rent after commencement of the summary process."
As this tender was made before the service of the notice to quit (the notice to quit was dated May 1, 1987, and included the rent disclaimer clause but was not served until May 2, 1987), the landlord presumably believed it had no alternative but to return the tender which was specifically labeled as rent if it wished to protect its summary process rights. Mayron's Bake Shop, Inc. v. Arrow Stores, Inc., supra. The rejection of the tender as rent did not mean that the landlord was nor entitled to reasonable use and occupancy for the premises. Courts in other jurisdictions have likewise held that a landlord's refusal of a tender of past due rent does not constitute a waiver or forgiveness of such a debt. Multach v. Adams, 418 So.2d 1254, 1255 (Fla.App. 1982); see also Katurah CT Page 3421 Corp. v. Wells, 454 N.Y.S.2d 770, 772 (1982). This court need not therefore address Tolland's claim that the March 3, 1987 letter constituted the unequivocal act so that the lease actually terminated at that time.
3.
The landlord has also claimed that the tender was ineffective as the corporation's bank statements and Mr. DiBella's testimony indicate that there was insufficient funds to cover the $34,337.31 check. (Exhibits 3, 4). Mr. DiBella testified that on May 4, 1987 a deposit of $30,000.00 was made but the tender, of course, was made on May 1, 1987. "[A] check written on insufficient funds does not constitute valid legal tender despite the drawer's willingness to deposit funds to cover the check." U.S. v. Allen, 699 F.2d 1117, 1122 (11th Cir 1983).
 III.
Conclusion
This court having found that the landlord is entitled to fair use and occupancy for its premises and that it did not wrongfully refuse to approve an assignment of the corporation's lease hereby enters:
(1) Judgment for the defendant (Tolland) in CVH-87-082558-BL.
(2) Judgment for the plaintiff (Tolland) in CVH-87-082557-EH against the defendant DiBella Bros., Inc. in the sum of $55,201.68 and against the defendants William J. DiBella, Thomas A. DiBella and Anthony N. DiBella individually in the sum of $30,000.00. Judgment to enter for the plaintiff on defendants counterclaim.
MARSHALL K. BERGER, JR. JUDGE, SUPERIOR COURT